# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JOSE R. PADILLA,

                       Plaintiff,

v.

                       Case No. 14-CV-98-JPS

DONALD RUCK, JENNIFER WOLLERT,
BARBRA SULLIVAN, LISA TETZLAFF,
LINDA LEITH, and KRISTIT O'CONNELL,

                       **ORDER**

                     Defendants.

The plaintiff, Jose Padilla, is a prisoner at the Wisconsin Resource Center ("WRC"). He filed this case on January 30, 2014, alleging an Eighth Amendment deliberate indifference claim against the defendants. (Docket #1). Mr. Padilla claims that the defendants were deliberately indifferent to his medical needs in failing to obtain new glasses for him after he broke his original pair. (Docket #1). The Court screened Mr. Padilla's complaint and allowed him to proceed on that claim. (Docket #8). The defendants have now moved for summary judgment. (Docket #69). That motion is fully briefed (Docket #84, #88), and the Court turns to decide it.

1.      BACKGROUND

The parties largely agree on the facts. The Court recounts the general procedures employed by WRC before discussing the plaintiff's specific circumstances.

1.1     General WRC Vision Procedures

The defendants are all employees of the State of Wisconsin or contract therewith and work at WRC. (*See* Wollert Decl. (Docket #77) ¶ 3; O'Connell Decl. (Docket #74) ¶ 3; Sullivan Decl. (Docket #75) ¶ 3; Tetzlaff Decl. (Docket

#76) ¶ 2; Leith Decl. (Docket #73) ¶¶ 2, 4, 5).[1] During the time period in question, Jennifer Wollert, Kristi O'Connell, and Barbara Sullivan all worked in the position of Nurse Clinician 2 at WRC. (Wollert Decl. ¶ 3; O'Connell Decl. ¶ 3; Sullivan Decl. ¶ 3). Lisa Tetzlaff was an Office Operations Associate with WRC's Health Services Unit. (Tetzlaff Decl. ¶ 2). Linda Leith worked in the position of Program Assistant Confidential for both WRC and the Winnebago Mental Health Institute ("WMHI"). (Leith Decl. ¶ 2). Finally, Donald Ruck was an optometrist at the Oshkosh Optical Center; he was contracted to provide eye care to WRC inmates, including Mr. Padilla. (Leith Decl. ¶ 4).

As is evident from the fact of Dr. Ruck having been contracted, WRC provides eye care services to inmates. (Tetzlaff Decl. ¶ 5; Docket #74, Ex. 2). Every two years, inmates are eligible to receive routine eye exams and updated prescription eyewear. (Tetzlaff Decl. ¶ 5; Docket #75, Ex. 4). To receive their eye exam, inmates must submit a Health Services Request ("HSR");[2] a nurse would then forward the HSR to an Office Operations

---

[1] Mr. Padilla did not dispute many of the defendants' proposed findings of fact. The Court would, therefore, be justified in relying on those facts as undisputed. Nonetheless, the Court will cite to the evidentiary record.

[2] HSRs are readily available to inmates so that they can make non-emergency requests for care; nursing staff address HSRs on a daily basis. (Wollert Decl. ¶¶ 7, 8; O'Connell Decl. ¶¶ 7, 8; Sullivan Decl. ¶¶ 7, 8). WRC's health staff attempts to provide for medical care needs based upon their assessment of what is necessary, and medical care may be provided either on- or off-site, depending on what sort of services the health staff believe is necessary. (Wollert Decl. ¶¶ 7–9; O'Connell Decl. ¶¶ 7–9; Sullivan Decl. ¶¶ 7, 8). Health staff may provide inmates with over-the-counter medications. (Wollert Decl. ¶¶ 10, 11; O'Connell Decl. ¶¶ 10, 11).

Associate,[3] who, in turn, would place the inmate on a waiting list and later schedule an appointment with an optometrist on a first-come-first-served basis. (Tetzlaff Decl.¶ ¶ 7–8; Docket #75, Ex. 4).

Dr. Ruck visited WRC once per week for about three hours per visit. (Tetzlaff Decl. ¶ 9). In those three hours, Dr. Ruck was typically able to see four patients for exams and four to six patients for adjustments to glasses that had arrived. (Tetzlaff Decl. ¶ 9). Given this limited availability, it often took inmates a month or more to receive an appointment with the optometrist, although occasionally inmates could see the optometrist earlier if there was a documented medical reason for doing so. (Tetzlaff Decl. ¶¶ 8, 10).

After Dr. Ruck saw any inmates for an exam, Dr. Ruck would take his exam notes back to his office when he left WRC. (Leith Decl. ¶ 4). One of Dr. Ruck's employees would then email any necessary eyewear orders to Linda Leith, who, in turn, would fax the orders to Hi-Tech Optical, a third-party vendor that is the only approved eyewear vendor for WRC. (Leith Decl. ¶¶ 4, 5).[4] When eyewear orders arrived at WRC from Hi-Tech Optical, the assigned Office Operations Associate would typically pick the order up from the mailroom on a Monday and schedule a fitting appointment for the inmate with Dr. Ruck to take place the next day. (Tetzlaff Decl. ¶ 15).

---

[3] This forwarding of an HSR to the Office Operations Associate is the only way that the nurses were involved in the optometry process. (Tetzlaff Decl. ¶ 11). The nurses do not have any other involvement in scheduling optometry appointments, moving inmates on the waiting list, or obtaining glasses. (Tetzlaff Decl. ¶ 11).

[4] Under WRC's standard policy, Dr. Ruck would send orders to Management Services, specifically Leith, at WMHI, who would, in turn, process the orders and send them to Hi-Tech Optical. (Docket #75, Ex. 4). Once the eyewear arrived at WMHI, WMHI's Management Services would send the eyewear to WRC.

When an inmate needs to have his eyewear repaired, the inmate must submit a HSR requesting a repair. (Tetzlaff Decl. ¶ 16). Any major repairs require off-site work, often resulting in broken glasses taking approximately four weeks to be repaired and returned to the inmate. (Tetzlaff Decl. ¶ 16; Docket #75, Ex. 4). Given this substantial delay for repairs, if an inmate needs a repair but is also eligible for the biennial exam and new pair of eyewear, then the nurses often forward the repair request to the Office Operations Associate so that an exam can be held and new glasses ordered, instead of sending out the glasses for repair. (Tetzlaff Decl. ¶ 16; Sullivan Decl. ¶ 14).

### 1.2    Mr. Padilla's Specific Situation

On July 1, 2013, Mr. Padilla submitted his first HSR indicating that he had broken his glasses. (Sullivan Decl. ¶ 9; Docket #75, Ex. 1). In his first HSR, he stated "I would like to know if I can get new glasses[.] If you cant send me new glasses ASAP please get me in for my 2 years eye check out." (Docket #75, Ex. 1). Sullivan, a nurse, immediately forwarded Mr. Padilla's HSR to Tetzlaff, the Office Operations Associate, noting that Mr. Padilla was eligible for his biennial eye exam and new pair of eyewear. (Sullivan Decl. ¶¶ 9, 15).

After Mr. Padilla submitted his first HSR, he had a number of encounters with health staff regarding other issues. Specifically:

(1)    on July 6, 2013, Mr. Padilla declined an interview for a nursing staffing note (Docket #77, Ex. 1 at 368–69);

(2)    on July 9, 2013, Mr. Padilla had a psychiatry appointment, at which he did not report any issues with his broken glasses or vision (Docket #77, Ex. 1 at 370); and

(3)    on July 11, 2013, Mr. Padilla had a nursing appointment, at which he discussed his progress on medication but did not complain of any pain related to his broken glasses (Docket #77, Ex. 1 at 192–93 (Mr. Padilla "is currently compliant with his

medications, and he denies any medical concerns right now, other than his chronic pain issues.")).

Mr. Padilla submitted a second HSR on July 16, 2013. (Docket #75, Ex. 2).[5] In this second HSR, Mr. Padilla noted that: he tried to tape his glasses together, but they would not hold; that he was having headaches; and that he would like his glasses as soon as possible, so that he could read and do other daily activities. (Docket #75, Ex. 2). Sullivan responded directly to Mr. Padilla's second HSR, stating that he would receive an eye exam. (Sullivan Decl. ¶¶ 18–19). She also sent Mr. Padilla's HSR directly to the Office Operations Associate, Tetzlaff. (Sullivan Decl. ¶ 19). Sullivan, however, determined that a further examination of Mr. Padilla was not necessary because, to the extent that Mr. Padilla was suffering from headaches, he had both prescription and over-the-counter pain medications immediately available to him. (Sullivan Decl. ¶¶ 20–22; Docket #77, Ex. 4). Moreover, in spite of Mr. Padilla's complaints about headaches, he did not receive any Tylenol between July 13, 2013, and July 23, 2013. (Sullivan Decl. ¶ 22; Docket #77, Ex. 4).

After Mr. Padilla submitted his second HSR, he had several more encounters with health staff. Specifically:

(1)     on July 20, 2013, Mr. Padilla attempted to hide his medication beneath his tongue, prompting health staff to take measures to ensure that he took his medications, including requiring Mr. Padilla to spend 15 minutes under observation after distribution of medication (Wollert Decl. ¶ 19; Docket #77, Ex.

---

[5]Mr. Padilla, in his statement of fact, asserts that, at this time and others, he told health staff about his headaches. (*See* Docket #84 at 3–4). This may be true, but ultimately it does not create any issues of material fact.

1 at 194–95, 272, 810 (nothing in these notes indicate that Mr. Padilla complained about his glasses or pain resulting));[6]

(2) on July 22, 2013, during medication pass, Mr. Padilla stated that he would refuse his medications if he was required to remain under observation following distribution of his medications (Wollert Decl. ¶ 22; Docket #77, Ex. 1 at 194 (nothing in this note indicates that Mr. Padilla complained about his glasses or pain resulting));

(3) on July 24, 2013, Mr. Padilla complained of pain in his leg and was examined, but did not complain about his lack of glasses or any resulting pain (Wollert Decl. ¶ 23; Docket #77, Ex. 1 at 194);

(4) on July 30, 2013, Mr. Padilla had an appointment with the epilepsy clinic, but did not complain about his lack of glasses or resulting pain (Wollert Decl. ¶ 24; Docket #77, Ex. 1 at 56, 194, 272);

(5) on July 31, 2013, Mr. Padilla again complained of leg pain, was prescribed ibuprofen, and was excused from walking class, but did not complain about his lack of glasses or resulting pain (Wollert Decl. ¶ 25; Docket #77, Ex. 1 at 56, 190–91, 272);

(6) on August 6, 2013, Mr. Padilla complained of chest pain and was seen by health staff, who encouraged him to take Tylenol, but he did not complain about his lack of glasses or resulting pain (Wollert Decl. ¶ 27; Docket #77, Ex. 1 at 189); and

(7) on August 13, 2013, Mr. Padilla had a psychiatric appointment, at which he reported various issues as a result of decreased sleep and a stoppage of medication, but he did not complain about his lack of glasses or resulting pain (Wollert Decl. ¶ 28; Docket #77, Ex. 1 at 189, 366–67).

Eventually, on August 27, 2013, Mr. Padilla had his optometrist appointment with Dr. Ruck. (Wollert Decl. ¶ 29; Docket #77, Ex. 2 at 805). At

---

[6]WRC's policies call for nurses to distribute medications at set times during the day; during these distribution times, inmates can complain about their medications or other health issues. (Wollert Decl. ¶ 20).

this appointment, Dr. Ruck found that Mr. Padilla needed new glasses and wrote a prescription for those glasses on August 27, 2013. (Docket #77, Ex. 2 at 805; Docket #78). Dr. Ruck's office emailed that prescription to Leith, who would normally process any eyewear prescription, on September 3, 2013. (Leith Decl. ¶ 10). Unfortunately, Leith was out of the office for medical reasons on September 3, 4, 5, 9, 13, and 16, of 2013. (Leith Decl. ¶ 8). She did not have a back-up in place and inadvertently missed the prescription (Leith Decl. ¶¶ 8, 11), and thus did not send the prescription out at this time.

After his appointment with Dr. Ruck, Mr. Padilla had other encounters with health staff. Specifically:

(1)     on September 5, 2013, Mr. Padilla had a psychiatric appointment at which he did not complain about his lack of glasses or resulting pain (Wollert Decl. ¶ 31; Sullivan Decl. ¶ 24; Docket #77, Ex. 1 at 364–65); and

(2)     on September 6, 2013, Mr. Padilla requested that he not be required to remain under observation after taking his medications and had a discussion with his doctor, but did not complain about his lack of glasses or resulting pain (Wollert Decl. ¶ 32; Docket #77, Ex. 1 at 183–84, 271).

On September 17, 2013, Mr. Padilla still had not received his glasses and, therefore, submitted his third HSR, this time asking when he would receive his new glasses (although he did not request a meeting with health staff about the issue). (Tetzlaff Decl. ¶ 18; Wollert Decl. ¶ 33; Docket #77, Ex. 5). Leith, of course, had not submitted the order at this time. (*See* Leith Decl. ¶¶ 8, 11). But Tetzlaff, who received a copy of this HSR, did not know that, and glasses often took a month or longer to arrive; thus, when she was notified of Mr. Padilla's HSR, she told Mr. Padilla simply to be patient and wait for his glasses to arrive. (*See* Tetzlaff Decl. ¶ 19; Wollert Decl. ¶¶ 34, 35; Docket #77, Ex. 5).

On October 7, 2013, Mr. Padilla submitted a fourth HSR, complaining that he still had not received his glasses, that he was having difficulty reading, and that he was suffering from headaches (again, he did not request a meeting with health staff about this issue). (Sullivan Decl. ¶ 23; Docket #75, Ex. 3). Mr. Padilla addressed this HSR to "Dr. M., Kolowski," which is very similar to "Dr. Micholowski," a psychiatrist at WRC. Nonetheless, Sullivan, a nurse, reviewed the HSR, because typically psychiatrists do not triage inmates' HSR requests.[7] Sullivan responded by writing "Exam 8-27-13" on the form. (Sullivan Decl. ¶ 25; Docket #75, Ex. 3). She then forwarded the form to Tetzlaff, who wrote "Where are new glasses? On their way!" (Sullivan Decl. ¶ 25; Docket #75, Ex. 3).

Mr. Padilla had two psychiatric appointments in October of 2013—one on October 7 and another on October 15—but did not complain about not having glasses or resulting pain at either appointment. (Wollert Decl. ¶¶ 37, 38; Docket #77, Ex. 1 at 360–63).

Mr. Padilla broke his right hand on November 2, 2013, after punching a wall. (Wollert Decl. ¶ 40; Docket #77, Ex. 1 at 140, 186–89, 270; Docket #77, Ex. 2 at 808–09). He was taken off site for treatment, where he received an x-ray, a splint for his hand, and a prescription for Vicodin. (Wollert Decl. ¶¶ 40, 41; Docket #77, Ex. 1 at 140, 186–89, 270, 612; Docket #77, Ex. 2 at 808–09). Health staff continued to monitor Mr. Padilla's hand on November 3, 2013, during which time Mr. Padilla received vicodin but rejected ibuprofen. (Wollert Decl. ¶¶ 42, 43; Docket #77, Ex. 1 at 181, 188). Mr. Padilla's vicodin

---

[7]Mr. Padilla complains that Sullivan and Tetzlaff "intercepted" his HSR, and that Dr. Micholowski is the individual who should have addressed Mr. Padilla's fourth HSR. (Pl. Resp. to Def. PFF ¶ 63). He does not, however, produce any evidence to support his contention that Dr. Micholowski should have reviewed the fourth HSR as opposed to Sullivan and/or Tetzlaff.

prescription expired on November 5, 2013. (Wollert Decl. ¶ 44; Docket #77, Ex. 1 at 181, 661). Throughout this period, Mr. Padilla did not mention any issues with his lack of glasses or resulting pain. (*E.g.*, Wollert Decl. ¶¶ 40–43; Docket #77, Ex. 1 at 140, 181, 186–89, 270, 612; Docket #77, Ex. 2 at 808–09).

Mr. Padilla submitted a fifth HSR on November 7, 2013. (Docket #74, Ex. 1). In it, Mr. Padilla again complained that he still had not received his glasses and had eye pain. (Docket #74, Ex. 1). Mr. Padilla may have checked a box on the form to request a meeting with health staff about his request, but it is unclear from the record whether, in fact, he did so. (O'Connell Decl. ¶ 12; Docket #74, Ex. 1). It does not appear that any health staff met with Mr. Padilla about this fifth HSR. (O'Connell Decl. ¶ 12; Docket #74, Ex. 1). O'Connell did, however, refer the fifth HSR to Tetzlaff for further handling because, as Office Operations Associate, Tetzlaff is the individual responsible for scheduling optometry appointments. (O'Connell Decl. ¶¶ 12–14; Docket #74, Ex. 1).

At this point, it having been several months since Mr. Padilla's appointment with Dr. Ruck, the nurses must have realized that there was some issue with Mr. Padilla's glasses; they asked Tetzlaff to check in on the status of the glasses. (Tetzlaff Decl. ¶ 21). Tetzlaff checked with Leith, who stated that she had missed the order when she was on medical leave. (Tetzlaff Decl. ¶ 22; Docket #76, Ex. 5). In an email, Tetzlaff stated:

> On 8-27-13 several inmates had exams and say they have not rec'd their new glasses yet. My supervisor asked me to check into one of the inmates glasses. His name is Padilla, Jose…. Also inmate [REDACTED] said the same thing. I know how in the past Dr. Ruck's Office has missed sending in some orders & I just wondered if this was one of those situations? Thanks!

(Docket #76, Ex. 5 at 5). Leith responded:

> To the best of my knowledge the glasses from 8/27/13 were not ordered. Should I order them now? I apologize and it was something that I missed during one of my sick times. Sorry…please pass along my apology to the inmates also.

(Docket #76, Ex. 5 at 5).[8] This was the first time that Leith realized that she had not sent in Mr. Padilla's order. (Leith Decl. ¶ 12; Docket #76, Exs. 1–5). After that, Tetzlaff confirmed that she wanted the glasses to be ordered immediately and, preferably, with a rush. (Docket #76, Ex. 5 at 4). Leith immediately did so. (Docket #76, Ex. 5 at 4; Leith Decl. ¶ 13).

After this time, Mr. Padilla had two more encounters with health staff. Specifically:

(1)    on November 9, 2013, Mr. Padilla was seen for a nursing staffing note, complaining that certain of his medication was not working, but did not complain about his lack of glasses or pain resulting therefrom (Wollert Decl. ¶ 45; Docket #77, Ex. 1 at 182); and

(2)    on November 14, 2013, Mr. Padilla was again seen for a staffing, complaining that he no longer wanted to take a vitamin pill, but again did not complain about his lack of glasses or pain resulting therefrom (Wollert Decl. ¶ 46, Docket #77, Ex. 1 at 178–79).

Mr. Padilla submitted a sixth HSR on November 15, 2013. (Docket #77, Ex. 6). He again complained that he had not received his glasses and also

---

[8]In a series of emails from January of 2014—approximately two months after Mr. Padilla had finally received his glasses—Tetzlaff asked whether she could avoid giving Mr. Padilla the name of Leith. (Docket #83, Ex. 9). Tetzlaff noted that she was concerned with turning over Leith's name, because Mr. Padilla might file a complaint. (Docket #83, Ex. 9). Holly Puhl, the nursing supervisor at WRC, said that Tetzlaff needed to turn over Leith's name and that, if Mr. Padilla filed a complaint, it might be a good thing: "Even if he complains, they [presumably, management] will look at the process and realize that [Leith] needs a backup to do her job when she is not here to do it. It will be a process improvement to ensure proper procedure so this doesn't happen again." (Docket #83, Ex. 9).

complained of head and eye pain. (Docket #77, Ex. 6). After receiving Mr. Padilla's sixth HSR, Wollert called Tetzlaff, who stated that Mr. Padilla's glasses had accidentally not been ordered but were now ordered on rush. (Wollert Decl. ¶ 48). Wollert responded to Mr. Padilla's sixth HSR by writing on the form: "The person from Dr Rucks clinic that orders glasses forgot to put your order in. Your glasses were ordered a week [and] a half ago with a rush order. They will be provided when available."[9] (Docket #77, Ex. 6).

Mr. Padilla submitted a seventh HSR on November 21, 2013. (Docket #77, Ex. 7).[10] In it, Mr. Padilla complained that he was having headaches. (Docket #77, Ex. 7). Fortunately, WRC had received Mr. Padilla's glasses that day. (*See* Wollert Decl. ¶ 52; Docket #77, Ex. 7). Thus, Wollert responded to Mr. Padilla's seventh HSR by noting that the glasses had come in and would be delivered; she directed Mr. Padilla to request an adjustment if he needed one. (Wollert Decl. ¶ 52; Docket #77, Ex. 7). Mr. Padilla's seventh HSR also complained that over-the-counter pain medication was not working, and that he would like "something stronger" to help with his pain. (Docket #77, Ex. 7).[11] There is no indication that he received any prescription medication to treat his pain.

---

[9]Wollert must have been confused, as it is now clear that Leith—not anyone from Dr. Ruck's office—failed to place the order.

[10]He had a psychiatry appointment two days before, on November 19, 2013, but there is no indication that he complained about lacking glasses or resulting pain during that meeting.

[11]The Court also notes that Mr. Padilla met with health staff twice on November 23, 2013—once complaining of hand pain, once complaining of leg pain—but did not report any issues regarding his lack of glasses or resulting pain during either meeting. (Wollert Decl. ¶¶ 53, 54; Docket #77, Ex. 1 at 180–81, 268).

The Court closes its discussion of the facts by pointing out that Mr. Padilla's use of pain medications—whether prescription or over the counter—remained fairly consistent throughout the period after he broke his glasses. In May of 2013, Mr. Padilla accessed over-the-counter pain medications (in this case, Tylenol tablets) on nine occasions. (Wollert Decl. ¶ 14; Docket #77, Ex. 4 (because two Tylenol tablets are distributed at a time, the Court is counting the distribution of two tablets as a single occasion and the distribution of four tablets as two occasions). In June of 2013, Mr. Padilla accessed over-the-counter pain medications (either aspirin or Tylenol) on seven occasions. (Wollert Decl. ¶ 15; Docket #77, Ex. 4). In June of 2013, Mr. Padilla was also prescribed Relafen, a non-steroidal anti-inflammatory medication, to treat hand pain. (Docket #74, Ex. 2 at 27).

In the following four months (July through October), Mr. Padilla's use of over-the-counter pain medication stayed the same. In July of 2013, Mr. Padilla received Tylenol on four occasions. (Wollert Decl. ¶ 26; Docket #77, Ex. 4). The Court acknowledges, however, that Mr. Padilla was still prescribed Relafen during July of 2013; that prescription expired in late July of 2013, after which time Mr. Padilla received a week-long prescription for a high dose of ibuprofen. (Docket #74, Ex. 2 at 24). In August of 2013, Mr. Padilla received Tylenol on eight occasions. (Wollert Decl. ¶ 30; Docket #77, Ex. 4). In September of 2013, Mr. Padilla received Tylenol on seven occasions. (Wollert Decl. ¶ 36; Docket #77, Ex. 4). In October of 2013, Mr. Padilla received Tylenol on five occasions. (Wollert Decl. ¶ 39; Docket #77, Ex. 4).

Then, in November and December of 2013, Mr. Padilla's Tylenol usage increased slightly. In November of 2013, Mr. Padilla received Tylenol on 27 occasions, by far the most of any month. (Wollert Decl. ¶ 55; Docket #77, Ex. 4). His receipt of Tylenol also seems to have increased in the latter half of

November of 2013, which makes sense; early in the month, after Mr. Padilla punched a wall and shortly before Mr. Padilla began claiming more vigorously that he was having head and eye pain as a result of not having glasses, Mr. Padilla received short-term prescriptions for both Vicodin and a high dose of ibuprofen. (Docket #74, Ex. 2 at 9). Mr. Padilla's receipt of Tylenol then decreased slightly in December of 2013, to a total of 17 occasions, which is still more than the other months that the Court has record of. (Wollert Decl. ¶ 56; Docket #77, Ex. 4).

Mr. Padilla's use of Tylenol could be attributed to many different things. Of course, it could relate to Mr. Padilla's alleged head and eye pain, as he asserts. On the other hand, it could relate to various other pain that Mr. Padilla might have had. For example, Mr. Padilla's increased use in November and December of 2013 could relate to the fact that he had broken his hand in early November. Meanwhile, his usage during other times could also be related to prior head trauma (Wollert Decl. ¶ 13; Docket #77, Ex. 1 at 51–54, 92–94) or to his various complaints of other leg, chest, and/or hand pain (Wollert Decl. ¶¶ 23, 25, 27, 53, 54; Docket #77, Ex. 1 at 56, 180–81, 189–91, 194, 272, 268).

2.    ANALYSIS

With that factual background in place, the Court turns to analyze the defendants' motion for summary judgment on Mr. Padilla's Eighth Amendment claim for deliberate indifference. The Court, as it must on summary judgment, accepts the facts in the light most favorable to Mr. Padilla. *Tradesman Int'l, Inc. v. Black*, 724 F.3d 1004, 1009 (7th Cir. 2013). "A motion for summary judgment is a contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law. The party pursuing the motion must make an initial showing that the

agreed-upon facts support a judgment in its favor." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a), (c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001); *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978–79 (7th Cir. 1996)). In reviewing a motion for summary judgment, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *King v. McCarty*, 781 F.3d 889, 895 (7th Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013)). "While the evidence is viewed in a light most favorable to the non-moving party, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. Inferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009)) (internal quotations omitted).

As to the merits of Mr. Padilla's claim, it is clear that Mr. Padilla ultimately faces a high hurdle in attempting to establish that the defendants violated the Eighth Amendment through deliberate indifference.

> The Eighth Amendment, applicable to the states through the Due Process Clause of the Fourteenth Amendment, protects prisoners from prison conditions that cause "the wanton and unnecessary infliction of pain," *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), including both hazardous prison conditions, *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994), and grossly inadequate medical care, *see Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). The burden is on the prisoner to demonstrate that prison officials violated the Eighth Amendment, and that burden is a heavy one. *See Whitley v. Albers*, 475 U.S. 312, 325 (1986).

*Pyles v. Fahim*, 771 F.3d 403, 408-09 (7th Cir. 2014). To meet his heavy burden, Mr. Padilla must establish two elements: (1) that he suffered from an objectively serious medical condition; and (2) that the defendants knew about his condition and the risk it posed, but nonetheless disregarded the risk. *Pyles*, 771 F.3d at 409 (citing *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011); *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009); *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). The Court addresses each of those two elements separately, as follows.

### 2.1 Objectively Serious Medical Condition

The defendants begin by arguing that Mr. Padilla has not established an objectively serious medical need.

"A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles*, 771 F.3d at 409 (citing *Knight*, 590 F.3d at 463; *Edwards v. Snyder*, 478 F.3d 827, 830–31 (7th Cir. 2007)). It is not clear whether a need for prescription glasses meets this requirement.

The Seventh Circuit has stated that a "need for prescription glasses *could conceivably* constitute a serious medical need." *Franklin v. McCaughtry*, 110 Fed. App'x 715, 721 (7th Cir. 2004) (emphasis added) (citing *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996)). But, of course, just because the need for glasses *could* constitute a serious medical need, does not mean that it *must*. In *McIntosh v. Malueg*, a 2011 case from this district, Judge William Griesbach acknowledged that "the need for glasses, especially reading glasses, is not per se a serious medical need." 2011 WL 3684777, *6 (Aug. 23, 2011) (citing *Borelli v. Askey*, 582 F. Supp. 512 (E.D. Pa. 1984); *Kemppainen v. Arkansas County Det. Ctr.*, 2010 WL 4918958, *8 (S.D. Tex. Nov. 23, 2010)).

Case 2:14-cv-00098-JPS   Filed 05/20/15   Page 15 of 29   Document 91

Thus, in *McIntosh*, where the inmate could "see well enough to read and write" and did not follow up with any further complaints of eye problems, Judge Griesbach found that the inmate's visual impairment was not objectively serious. *McIntosh*, 2011 WL 3684777, at *6.

Dealing with eye issues more generally is *Burks v. Raemisch*, a 2009 case from the Seventh Circuit in which the plaintiff had a pinhole in his left retina. 555 F.3d 592, 594 (7th Cir. 2009). The Seventh Circuit appears to have accepted that this was an objectively serious issue, but did so with little analysis (likely because it was merely evaluating the sufficiency of the prisoner's complaint, as opposed to summary judgment as is before this Court). *See id.* In any event, *Burks* is readily distinguishable, because the plaintiff's eye injury there—a pinhole that caused permanent vision impairment, which could have been avoided with proper treatment—was much more serious than Mr. Padilla's condition. *Id.*

The picture from other circuits is not much clearer. In 2007, the Tenth Circuit collected several cases from multiple circuits dealing with eye-related complaints. *Harris v. Morales*, 231 Fed. App'x 773, 775 (10th Cir. 2007) (citing *Koehl*, 85 F.3d at 87–88; *Mitchell v. Maynard*, 80 F.3d 1433, 1443 (10th Cir. 1996); *Kersh v. Derozier*, 851 F.2d 1509, 1510, 1513 (5th Cir. 1988); *Freeman v. Lockhart*, 503 F.2d 1016, 1017 (8th Cir. 1974); *United States v. Woodlee*, 136 F.3d 1399, 1409 (10th Cir. 1998); *United States v. Talamante*, 981 F.2d 1153, 1158 (10th Cir. 1992)). However, like *Burks*, those cases all dealt with more serious situations than the one at hand: in *Koehl*, without glasses one of the plaintiff's eyes would lose vision then shift to the corner of his socket, which would, in turn, cause him to bump into things and potentially injure himself; in *Kersh*, the plaintiff had hay in his eye that caused redness, tearing, bleeding, and loss of sight; in *Freeman*, the plaintiff had tuberculosis that settled in his eye;

in *Woodlee*, the court determined that outpatient eye surgery constituted "serious bodily injury" under U.S.S.G. § 1B1.1; *Talamante* involved the loss of an eye. In the least serious case, *Mitchell*, the Tenth Circuit noted that the plaintiff was diagnosed with a "visual condition of presbyopia." 80 F.3d at 1439. Presbyopia is nothing more than the gradual loss of one's ability to focus on nearby objects, and is "a natural, often annoying part of aging." Mayo Clinic, *Diseases and Conditions: Presbyopia, Definition* (Oct. 17, 2014) (available at: http://www.mayoclinic.org/diseases-conditions/presbyopia/basics/definition/con-20032261). Clearly, that condition is mild, but it *is* at least a diagnosed condition other than general limited vision. And, in any event, the *Maynard* court largely ignored the issue of whether the vision problems constituted an objectively serious medical need, instead resolving the case on the basis of lack of the defendants' knowledge. 80 F.3d at 1443–44. In sum, the Court cannot locate any other circuit court cases that clearly apply to Mr. Padilla's situation. Practically all other vision-related cases deal with more serious issues than Mr. Padilla's.

The Ninth Circuit, for instance, recently decided that a prisoner with monocular blindness and a cataract had an objectively serious medical condition. *Colwell v. Bannister*, 763 F.3d 1060, 1067–68 (9th Cir. 2014). But, cataracts are more serious than run-of-the-mill bad eyesight, often requiring surgery. *See id.*, at 1080 (Bybee, Circuit Judge, dissenting). And, in any event, as the dissent in *Colwell* points out, there is substantial disagreement amongst the country's district courts over whether a cataract presents an objectively serious medical need. *Id.* (collecting cases). Even the Ninth Circuit had previously reached a contrary conclusion. *Hummer v. Schriro*, 407 Fed App'x 112, 113 (9th Cir. 2010). If the country's courts cannot agree that *cataracts* are objectively serious, the Court hesitates to treat as objectively serious Mr.

Padilla's seemingly minor vision impairment. (*See* Docket #78 (Mr. Padilla's prescription for glasses, noting that there is a blur at distance and near without prescription lenses, but that Mr. Padilla has "[n]o apparent pathology")).

In the end, the Court concludes that Mr. Padilla's condition was not objectively serious. Certainly, nothing in the case law compels the Court to find that his vision issues were *per se* objectively serious. *See, e.g.*, *Franklin*, 110 Fed. App'x at 721; *McIntosh*, 2011 WL 3684777, *6. Furthermore, on the state of the evidentiary record, Mr. Padilla has not met his burden to show that his condition was objectively serious. Unlike the plaintiffs in the other cases that the Court discussed, Mr. Padilla does not suffer from any extremely serious vision issues. He has not alleged that his loss of vision caused him to bump into anything causing injury, *Koehl*, 85 F.3d at 87–88; he does not suffer from serious physical symptoms such as shifting or bleeding in his eyes, *Id.*; *Kersh*, 851 F.2d at 1510, 1513; he is not suffering from a degenerative condition, *Mitchell*, 80 F.3d at 1443. Rather, the evidence establishes only that Mr. Padilla had blurry vision at near and far distance, but otherwise did not have any "apparent pathology." (Docket #78). Mr. Padilla, himself, insists only that he suffered headaches, eye-aches, and dizziness. But Mr. Padilla has produced little evidence to support this contention. While he may have complained about these symptoms at some point (he did not complain of dizziness until after four months without glasses), he did not see fit to raise the issue in his myriad meetings with medical staff at WRC, thus undermining his assertion that his symptoms were serious. (*See generally* Section 1.2, *supra* (recounting, at length, the various occasions on which Mr. Padilla met with medical staff without reporting this problem)). His use of aspirin could be attributable to his routine complaints of pain and his broken

hand, as opposed to any headaches he received as a result of lacking glasses. (Wollert Decl. ¶¶ 13–15 23, 25–27, 30, 36, 39, 53–56; Docket #77, Ex. 1 at 51–54, 56, 92–94, 180–81, 189–91, 194, 272, 268; Docket #74, Ex. 2 at 24, 27; Docket #77, Ex. 4). And, likewise, the onset of his dizziness coincided with his use of vicodin for his broken hand. (Docket #74, Ex. 1; Docket #74, Ex. 2 at 9; Docket #77, Ex. 1 at 140, 187–89, 269–70).

In short, it is Mr. Padilla's burden to show that he was suffering from an objectively serious medical need. *See Pyles*, 771 F.3d at 409. Because he has failed to do so, the Court is obliged to grant the defendants' motion for summary judgment on the basis of Mr. Padilla's failure to establish an objectively serious medical need.

### 2.2 Subjective Deliberate Indifference

Even if the Court were to have found that Mr. Padilla could avoid summary judgment on the medical-need issue, the Court would still be obliged to grant summary judgment because Mr. Padilla cannot establish that the defendants were subjectively deliberately indifferent to his needs.

To demonstrate subjective deliberate indifference, "a prisoner must demonstrate that prison officials acted with a 'sufficiently culpable state of mind.'" *Townsend v. Cooper*, 759 F.3d 678, 689 (7th Cir. 2014) (quoting *Farmer*, 511 U.S. at 834; citing *Greeno*, 414 F.3d at 653). This requires that "officials must know of and disregard an excessive risk to inmate health; indeed they must 'both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and 'must also draw the inference.'" *Greeno*, 414 F.3d at 653 (quoting *Farmer*, 511 U.S. at 834). In other words, Mr. Padilla must demonstrate that the defendants "'knew of a substantial risk of harm to [him] and disregarded that risk.'" *Townsend*, 759 F.3d at 689 (quoting *Greeno*, 414 F.3d at 653). *Accord Pyles*, 771 F.3d at 409 (citing *Arnett*, 658 F.3d

at 751; *Greeno*, 414 F.3d at 653). It is clear that negligence is insufficient to show deliberate indifference. *See, e.g.*, *Farmer*, 511 U.S. at 835–39; *Olson v. Morgan*, 750 F.3d 708, 713 (7th Cir. 2014). *Accord McGee v. Adams*, 721 F.3d 474, 480–81 (7th Cir. 2013) (deliberate indifference is more than mere negligence; it is, at minimum, "'essentially a criminal recklessness standard, that is, ignoring a known risk.'") (quoting *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006)). Even gross negligence seems to be insufficient to impose constitutional liability on the defendants. *McGee v. Adams*, 721 F.3d 474, 480-81 (7th Cir. 2013) (citing *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006); *Collignon v. Milwaukee Cty.*, 163 F.3d 982, 988 (7th Cir.1998)).

With that backdrop in mind, the Court will address each of the defendants individually.

### 2.2.1   Donald Ruck

The Court begins by acknowledging that the plaintiff has expressed a desire to dismiss Dr. Ruck from this lawsuit. (Docket #64; Docket #72, 18:22–19:8).

Even if Mr. Padilla had not agreed to do so, the Court would clearly be obliged to dismiss Dr. Ruck. Dr. Ruck did everything required of him, including timely examining Mr. Padilla's eyes and sending Mr. Padilla's prescription to Linda Leith. (Wollert Decl. ¶ 29; Leith Decl. ¶ 10; Docket #77, Ex. 2 at 805; Docket #78). Dr. Ruck had no further indication that Mr. Padilla had not received his glasses, and so cannot be said to have known of any risk to Mr. Padilla. Thus, Dr. Ruck cannot be liable, and the Court must grant summary judgment in his favor. *Greeno*, 414 F.3d at 653 ("officials must *know of* and disregard an excessive risk to inmate health") (emphasis added).

### 2.2.2 Linda Leith

The Court must also grant summary judgment in favor of Leith. Leith was absent for medical reasons on the day that Dr. Ruck sent Mr. Padilla's prescription to her. Thus, accidentally, she did not notice Mr. Padilla's prescription and did not order it until several months later.

At most, this amounts to negligence, which is insufficient to show deliberate indifference. *See, e.g., Farmer,* 511 U.S. at 835–39; *Olson,* 750 F.3d 713; *McGee,* 721 F.3d at 480–81. Mr. Padilla has not produced any evidence to show that Leith knew about her failure until the very day that she placed the order; indeed, the evidence establishes that Leith ordered the glasses on rush immediately upon finding this out and even asked that her apology be passed on to Mr. Padilla. (Leith Decl. ¶¶ 8, 10, 11; Docket #76, Ex. 5). And, without having knowledge of Mr. Padilla's medical need, Leith cannot possibly be liable for an Eight Amendment violation. *Greeno,* 414 F.3d at 653 ("officials must *know of* and disregard an excessive risk to inmate health") (emphasis added). Thus, summary judgment in her favor is appropriate.

### 2.2.3 Lisa Tetzlaff

The Court must also grant summary judgment in favor of Lisa Tetzlaff. Tetzlaff's interactions with Mr. Padilla were limited to the following occurrences:

(1) she received Mr. Padilla's first two HSRs, dated July 1, 2013, and July 16, 2013, requesting an eye exam and new glasses (Sullivan Decl. ¶¶ 9, 15, 18–19; Docket #75, Exs. 1, 2) and scheduled an exam, which occurred on August 27, 2013 (Wollert Decl. ¶ 29; Docket #77, Ex. 2 at 805; Docket #78);

(2) she received Mr. Padilla's third HSR, dated September 17, 2013, and responded by telling Mr. Padilla to be patient and wait for his glasses to arrive (Tetzlaff Decl. ¶¶ 18, 19; Wollert Decl. ¶¶ 33–35; Docket #77, Ex. 5);

(3)     she received Mr. Padilla's fourth HSR, dated October 7, 2013, and responded by telling Mr. Padilla "Where are new glasses? On their way!" (Sullivan Decl. ¶¶ 23, 25; Docket #75, Ex. 3); and

(4)     she received Mr. Padilla's fifth HSR and checked into the status of his glasses, whereupon she discovered that Leith had missed the order and failed to order them (O'Connell Decl. ¶¶ 12–14; Tetzlaff Decl. ¶¶ 21, 22; Docket #74, Ex. 1; Docket #76, Ex. 5), and immediately directed that the glasses be ordered on rush (Docket #76, Ex. 5 at 4; Leith Decl. ¶ 13).

None of those actions rise to the level of deliberate indifference.

As to the first two HSRs, it is clear that Tetzlaff took swift action, because Mr. Padilla received an eye exam shortly after submitting his request. Thus, these actions cannot even be deemed negligence. They clearly do not qualify as deliberate indifference.

On the other hand, Tetzlaff did not handle the third and fourth HSRs perfectly; she twice relied upon her belief that Mr. Padilla's glasses had been ordered and were on their way when, in fact, that was not true, but she still cannot be liable for deliberate indifference. Mr. Padilla has not produced any evidence to show that Tetzlaff knew or believed otherwise. *Greeno*, 414 F.3d at 653 ("officials must *know of* and disregard an excessive risk to inmate health") (emphasis added). Instead, Tetzlaff's actions with regard to the third and fourth HSRs were, at most, negligence, which is not enough to show deliberate indifference. *See, e.g.*, *Farmer*, 511 U.S. at 835–39; *Olson*, 750 F.3d 713; *McGee*, 721 F.3d at 480–81. Finally, the Court notes that Mr. Padilla can recover only against individuals who were personally responsible for any deprivation against him. *Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005); *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003), *cert denied*, 541 U.S. 975 (2004). "[P]ublic employees are responsible for their own

misdeeds but not for anyone else's." *Burks*, 555 F.3d at 596. In *Burks*, the Seventh Circuit made clear the limits of public employees' obligations:

> Public officials do not have a free-floating obligation to put things to rights, disregarding rules (such as time limits) along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen.

*Id.* at 595. So long as a public employee does not create peril or do anything to increase it or make it harder to solve, she generally cannot be liable—even for doing nothing. *Id.* at 596. In this case, it was Leith's job to order the glasses, and Tetzlaff had every reason to believe that she had done so. It often takes a month or more for glasses to arrive, so Tetzlaff would not have known upon receiving the third and fourth HSRs that anything was amiss. For all of these reasons, Tetzlaff cannot be liable for deliberate indifference, and the Court is obliged to grant summary judgment in her favor.

### 2.2.4   Barbra Sullivan

The Court must also grant summary judgment to Sullivan, O'Connell, and Wollert, three nurses on Mr. Padilla's unit.

Each nurse had fairly limited relevant interaction with Mr. Padilla. Sullivan engaged with Mr. Padilla in two primary ways. First, she received Mr. Padilla's first two HSRs, dated July 1, 2013, and July 16, 2013, and sent both directly to Tetzlaff so that Mr. Padilla could be scheduled for an eye exam (Sullivan Decl. ¶¶ 9, 15, 19; Docket #75, Ex. 1; Docket #75, Ex. 2); in response to the second, she also told Mr. Padilla that he would receive an eye exam soon and determined that medical treatment was unnecessary beyond Mr. Padilla's access to pain medications (Sullivan Decl. ¶¶ 18–22; Docket #75,

Ex. 2; Docket #77, Ex. 4). Second, she received Mr. Padilla's fourth HSR, dated October 7, 2013, which was (presumably) addressed to a psychiatrist at WRC, and addressed the HSR herself, because psychiatrists typically do not triage HSRs (Sullivan Decl. ¶¶ 23, 25; Docket #75, Ex. 3); in response, Sullivan wrote "Exam 8-27-13," and immediately forwarded the request to Tetzlaff (who responded that the glasses were on their way) (Sullivan Decl. ¶ 25; Docket #75, Ex. 3).

O'Connell's only involvement was receiving Mr. Padilla's fifth HSR, dated November 7, 2013, which she immediately sent to Tetzlaff, after which Tetzlaff contacted Leith and Leith discovered her error. (O'Connell Decl. ¶¶ 12–14; Docket #74, Ex. 1).

Wollert received three HSRs from Mr. Padilla. First, it appears that she might have received Mr. Padilla's third HSR, dated September 17, 2013 (*see* Wollert Decl. ¶¶ 33–35; Docket #77, Ex. 5 (neither indicate which staffmember received the September 17, 2013, HSR)), and if she did she immediately sent it to Tetzlaff, who responded by informing Mr. Padilla that his glasses would arrive shortly (Tetzlaff Decl. ¶ 19; Wollert Decl. ¶¶ 34, 35; Docket #77, Ex. 5). Second, she received Mr. Padilla's sixth HSR, dated November 15, 2013, which prompted her to call Tetzlaff, who told her that the glasses accidentally had not been ordered, but were on rush; Wollert, thus, responded to Mr. Padilla's sixth HSR by informing him that someone from Dr. Ruck's clinic had made an error and that his glasses would arrive shortly. (Wollert Decl. ¶ 48; Docket #77, Ex. 6). Third, Wollert received Mr. Padilla's seventh HSR, dated November 21, 2013; Wollert responded by informing Mr. Padilla that his glasses had arrived and he would receive them very soon, but she did not accommodate Mr. Padilla's request for "something

stronger" than over-the-counter medication to treat his pain. (Wollert Decl. ¶ 52; Docket #77, Ex. 7).

To begin, the nurses cannot be liable for their handling of Mr. Padilla's HSRs insofar as the HSRs requested an optometry appointment and new glasses. In each instance, the nurses did exactly what was required of them. Sullivan and O'Connell both immediately forwarded the HSRs to Tetzlaff. It was Tetzlaff's job, in turn, to coordinate with Dr. Ruck and Leith to schedule an optometry appointment and ensure that glasses were ordered, respectively. Wollert also addressed the HSRs appropriately. With respect to the third, she passed it on to Tetzlaff. With respect to the sixth and seventh, after it was clear that Leith had made a mistake but ordered the glasses on rush, Wollert coordinated with Tetzlaff to ensure that the glasses were arriving, but no further action on the HSRs was necessary—the glasses were clearly on their way and Mr. Padilla was, otherwise, only complaining about pain. None of the nurses had a duty to ensure that an appointment occurred quickly or that the glasses were timely ordered, and thus they cannot be liable on that basis. *See Burks*, 555 F.3d at 595–96. Their only responsibility was to send the HSRs to the appropriate person (Tetzlaff) to ensure that Mr. Padilla would receive his optometry appointment and glasses; the nurses did so in each instance that it was necessary. Thus, their treatment of the HSRs, insofar as the HSRs requested an optometry appointment and new glasses, was entirely appropriate, clearly not rising to the level of deliberate indifference.

The only other basis for finding deliberate indifference—that the nurses ignored Mr. Padilla's complaints of pain—lacks merit for several reasons. The nurses cannot be liable unless they were "'aware of facts from which the inference could be drawn that a substantial risk of serious harm

exist[ed].'" *Greeno*, 414 F.3d at 653 (quoting *Farmer*, 511 U.S. at 834). In this case, the nurses would not have been able to draw an inference of a substantial risk of serious harm. To begin, a majority of Mr. Padilla's HSRs did not include any information from which the nurses could draw an inference of a substantial risk of harm. Some HSRs merely requested information about his request for glasses, which is not enough to show the nurses' awareness of required facts. *See Banks v. Montgomery*, No. 3:09-CV-23, 2009 WL 1657465, at *4 (N.D. Ind. June 11, 2009) ("A request for an eye exam to get new glasses does not, by itself, suggest a serious condition."). Likewise, Mr. Padilla did not specifically ask to be seen by health staff in the HSRs that Sullivan and Wollert received. Thus, Sullivan and Wollert—if they had any facts about Mr. Padilla's pain—could not draw an inference that a substantial risk of serious harm existed. *See Vasquez v. Braemer*, 586 Fed. App'x 224, 227-28 (7th Cir. 2014) (letters from defendant requesting additional outdoor time to stabilize mental condition did "not reflect that the defendants believed that he faced serious harm"). The HSR received by O'Connell *may* have indicated a request to see health staff. (*see* O'Connell Decl. ¶ 12; Docket #74, Ex. 1; DPFF ¶ 74). But, in that HSR, Mr. Padilla complained only of head and eye pain, which he could treat on his own with over-the-counter medication available to him, and of his lack of glasses, which O'Connell addressed by sending the HSR to Tetzlaff. Because Mr. Padilla had medication readily available to him to treat his pain-related complaints, Wollert had no reason to draw an inference that a substantial risk of serious harm existed. Precisely the same can be said of Mr. Padilla's other complaints of pain in his other HSRs. If he was, indeed, having headaches, he had the same relief available to him that all people (inmates and non-inmates alike) have on a daily basis. Mr. Padilla chose to use those medications only

sparingly. *See Pinkston v. Madry*, 440 F.3d 879, 892 (7th Cir. 2006) (defendants not deliberately indifferent where inmate refused medical care); *Walker v. Peters*, 233 F.3d 494, 500 (7th Cir. 2000) (defendants not deliberately indifferent when inmate refused to take a preliminary test before treatment). Additionally, in Mr. Padilla's seventh HSR, which Wollert received, Mr. Padilla asked for "something stronger" than over-the-counter pain medication, which Wollert did not provide; but at that point, Wollert believed that Mr. Padilla's glasses had arrived, which would vitiate his need for pain medication.

Finally, the Court points out that the nurses did just about everything they *could have* done; they passed on Mr. Padilla's HSRs quickly and did nothing to prevent Mr. Padilla from receiving pain medication. Mr. Padilla does not indicate what else the nurses could have or should have done in this situation.

For all of these reasons, the Court is obliged to grant summary judgment in favor of nurses Sullivan, O'Connell, and Wollert.

3.    CONCLUSION

For all of the foregoing reasons,[12] the Court is obliged to grant the defendants' motion for summary judgment.

The Court also notes that, at the time Mr. Padilla filed his brief in opposition to the defendants' motion for summary judgment, he filed a renewed motion to appoint counsel. (Docket #87). It appears that his request is related to recruitment of counsel for trial, if trial were to occur. (Docket #87 ¶¶ 3–4). The Court having determined that it must dismiss this matter on

---

[12]The Court also notes that the defendants have raised a qualified immunity argument. That argument may have substantial merit, but the Court need not address it, because it has found that the defendants succeed on the merits.

summary judgment, recruitment of counsel for trial is unnecessary, so the Court will deny the motion on that basis. To the extent that Mr. Padilla is requesting recruitment of counsel for some other aspect of the case, the Court has already addressed that issue several times (Docket #40, #55, #61), and Mr. Padilla has not added any information that would change the Court's analysis. The defendants' motion for summary judgment was not extremely complicated; it discussed some medical evidence, such as the plaintiff's use of over-the-counter pain medications and Mr. Padilla's glasses prescription, but even that evidence was easy to understand for the reasons used by the defendants, and was ultimately of little importance to the decision. *See Dewitt v. Corizon, Inc.*, 760 F.3d 654, 658 (7th Cir. 2014) (making clear that deliberate indifference cases do not *per se* require recruitment of counsel) (citing *Olson v. Morgan*, 750 F.3d 708, 711–12 (7th Cir. 2014); *Romanelli v. Suliene*, 615 F.3d 847, 854 (7th Cir. 2010) as examples of cases where it was not an abuse of discretion to deny recruitment). Mr. Padilla, in turn, filed a well-written brief with citations to case law and also addressed several factual issues. (Docket #83, #84, #86). His factual disputes were ultimately poorly supported and of little relevance and his legal arguments did not prevail, but this was because Mr. Padilla's case was not a strong one to begin with. Mr. Padilla was clearly capable of presenting his case. For these reasons and the others that the Court articulated in its several prior orders (Docket #40, #55, #61), this case at the summary judgment stage was not extremely difficult and appeared to have been well within Mr. Padilla's grasp throughout the summary judgment process (as well as before it). Thus, recruitment would be inappropriate under the second prong of *Pruitt v. Mote*, because "the difficulty of the case—factually and legally—" does not "exceed[] the particular plaintiff's capacity as a layperson to coherently present it." 503 F.3d 647, 655 (7th Cir.

2007) (*en banc*). For these reasons, the Court is obliged to deny Mr. Padilla's motion for recruitment of counsel

Accordingly,

IT IS ORDERED that the defendants' motion for summary judgment (Docket #69) be and the same is hereby GRANTED and this matter be and the same is hereby DISMISSED with prejudice.

IT IS FURTHER ORDERED that the plaintiff's motion for recruitment of counsel (Docket #87) be and the same is hereby DENIED.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 20th day of May, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge